# EXHIBIT 1

**EXECUTION COPY**

# INTELLECTUAL PROPERTY RIGHTS
## ASSIGNMENT AGREEMENT

This INTELLECTUAL PROPERTY RIGHTS ASSIGNMENT AGREEMENT (this "Agreement") made as of February 21st, 2006, by and among Traeger Pellet Grills LLC, a limited liability company under the laws of the State of Florida ("Buyer"), Joe Traeger, an individual residing at P.O. Box 1070, 255 Alder Street, Mt. Angel, Oregon 97362 ("Joe Traeger") Brian Traeger, an individual residing at 405 Cindy Lane, Mt. Angel, Oregon 97362 ("Brian Traeger"), Mark Traeger an individual residing at P.O. Box 308, 260 S. Oak Street, Mt. Angel, Oregon 97362 ("Mark Traeger"), Randy Traeger, an individual residing at 530 Alder Street, Mt. Angel, Oregon 97362 ("Randy Traeger") (Joe Traeger, Brian Traeger, Mark Traeger, and Randy Traeger are referred to collectively as the "Sellers").

### W I T N E S S E T H :

WHEREAS, the Sellers are the record and beneficial owners of all of the Intellectual Property Rights, as hereinafter defined;

WHEREAS, the Intellectual Property Rights are used or useful in the conduct of the business of design, assembly, warehousing, manufacture, marketing, sale and distribution of wood pellet grills and smokers, wood pellet BBQs, camp stoves, other cooking devices using wood pellets, and flavored and/or BBQ wood pellets and related products and accessories for the foregoing (the "Business"); and

WHEREAS, the Buyer has simultaneously with the execution hereof, entered into an Asset Purchase Agreement, dated of even date herewith, with Traeger Industries, Inc., a corporation organized and existing under the laws of the State of Oregon (the "Company"), the Sellers and their Affiliates (the "Asset Purchase Agreement") to purchase the assets of the Company; and

WHEREAS, the Sellers desire to sell and assign to the Buyer all of the Intellectual Property Rights and the Buyer desires to purchase from the Sellers at the Closing all of the then Intellectual Property Rights, in each case upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties, intending legally to be bound, agree as follows:

[A list of defined terms is provided in Article 8 hereof]

Article 1.        Purchase and Sale

1.1        General.  At the Closing (as defined in Section 1.5 hereof), and subject to the terms and conditions of this Agreement, the Sellers agree to sell, assign, convey and deliver to

{M1429618_15}

the Buyer, and the Buyer agrees to purchase, acquire and accept from the Sellers, all of Seller's right, title, and interest in and to the Intellectual Property Rights.

1.2     Assignment of Rights.

(a)     For good and valuable consideration, the sufficiency of which is hereby acknowledged, Sellers hereby agree to assign and transfer to Buyer all of their right, title and interest in and to the Intellectual Property Rights, and Buyer hereby agrees to accept such assignment (the "Assignment").

(b)     On and after the Closing Date, Sellers shall, from time to time and promptly upon request by Buyer, in order to effect and perfect the Assignment contained herein or to enable Buyer to obtain the full benefits of this Agreement and the transactions contemplated hereby, (i) deliver to Buyer records, data or other documents relating to the Intellectual Property Rights that are in the possession of Sellers and its Affiliates or will be in the possession of Sellers and its Affiliates, (ii) execute and deliver assignments, licenses, consents, documents or further instruments of transfer, and (iii) take other actions, render other assistance and execute other documents as requested by Buyer. Sellers will also assist Buyer in filing and prosecuting United States and foreign patent, copyright and trademark applications claiming the Intellectual Property Rights.

(c)     Buyer, in the exercise of its sole discretion, may add to, subtract from, arrange, rearrange, revise, abandon, adapt and translate all or any part of the Intellectual Property Rights, and/or combine the Intellectual Property Rights with any other work by any other person(s); and/or change or substitute the title of the Intellectual Property Rights. Sellers hereby waives any so-called "droit moral" or "moral rights of authors" or any similar rights in and/or to the Intellectual Property Rights. Sellers shall not institute, support, maintain or permit any action or lawsuit on the ground that any version of the Intellectual Property Rights, or any part thereof, as produced, used, exhibited, abandoned, enforced or not enforced or exploited by or on behalf of Buyer in any manner whatsoever (i) constitutes a violation of any of Sellers' "moral rights" or other rights in any country of the world, (ii) defames or mutilates the Intellectual Property Rights or any part thereof, (iii) contains unauthorized variations, alterations, modifications, changes or translations or (iv) defames or injures any of the Sellers in any manner.

1.3     Delivery of Assignments.  At the Closing, and subject to the terms and conditions of this Agreement, the Sellers shall deliver to the Buyer in form and substance satisfactory to the Buyer assignments of the Intellectual Property Rights to be filed as applicable, with the domestic and foreign patent and trademark offices, and such other instruments as shall reasonably be required to transfer to the Buyer all right, title and interest in and to the Intellectual Property Rights, free and clear of any Encumbrances.

1.4     Purchase Price; Payment.

(a)     The consideration for the sale of the Intellectual Property Rights shall be the aggregate of :

(i)     No later than 5:00 p.m., Tampa, Florida time on the first Business Day following the execution and delivery hereof by all parties hereto, the Buyer shall

deliver to the Escrow Agent a deposit of cash in an amount equal $2,000,000.00 (Two Million Dollars) (the "Deposit"). The parties agree that the Sellers shall have the right to draw on the Deposit and retain the proceeds thereof if (A) the Sellers are ready, willing and able to close the transactions contemplated hereby and by the Asset Purchase Agreement on the Closing Date, the Sellers and Traeger Industries, Inc. have not violated their representations, warranties or covenants herein or in the Asset Purchase Agreement and have satisfied the Closing conditions herein and in the Asset Purchase Agreement, and Buyer is not prepared to close or (B) the Closing occurs. In the event that the Sellers are not ready, willing and able to close the transactions contemplated hereby and by the Asset Purchase Agreement on the Closing Date, or the Sellers or Traeger Industries, Inc. have violated their representations, warranties or covenants herein or in the Asset Purchase Agreement or have not satisfied the conditions to the Closing herein or in the Asset Purchase Agreement and the Buyer is prepared to close, then the Deposit shall be returned to the Buyer.

(ii)     $9,000,000.00 (Nine Million Dollars) (the "Cash Payment"), less the amount of the Deposit referred to in clause (i) above and interest thereon, payable by certified or bank check, or by wire transfer at the Closing to the Sellers pro rata in accordance with Annex I hereto.

(iii)     As additional consideration for the Sellers under the terms of this Agreement, Sellers shall receive, pro rata in accordance with their interests as set forth on Annex I hereto, during the period hereafter set forth, a contingent amount calculated as follows:

(A)     The contingent amount will be calculated each calendar year, during the three years ending December 31, 2008. The maximum aggregate amount to be paid to Sellers during the three years, shall be $2,000,000.00 (Two Million Dollars), calculated each year and payable thirty (30) days after completion of the audited financial statements of the Buyer for the respective calendar year (but in no event later than 120 days after such December 31).

(B)     Each of the three years ending December 31, 2008 a calculation shall be made:

(I)  For the year ending December 31, 2006, the contingent amount of $666,666 (Six Hundred Sixty Six Thousand Six Hundred Sixty Six Dollars) will be paid if but only if the Buyer achieves EBITDA of $4,100,000 (Four Million One Hundred Thousand Dollars) during the year ending December 31, 2006. In the event the Buyer achieves EBITDA of less than $4,100,000.00 (Four Million One Hundred Thousand Dollars) but more than $3,433,334.00 (Three Million Four Hundred Thirty Three Thousand Three Hundred Thirty Four Dollars), then the contingent amount payable in respect of 2006 shall be amount of EBITDA earned during 2006 in excess of $3,433,334.00 (Three Million

Four Hundred Thirty Three Thousand Three Hundred Thirty Four Dollars).

(II)  For the year ending December 31, 2007, the contingent amount of $666,667 (Six Hundred Sixty Six Thousand Six Hundred Sixty Seven Dollars) will be paid if the Buyer achieves net sales of at least $22,000,000.00 (Twenty Two Million Dollars) and EBITDA of at least $4,300,000 (Four Million Three Hundred Thousand Dollars) during the year ending December 31, 2007.  In the event that for the year ended December 31, 2007 Buyer achieves net sales of at least $22,000,000.00 (Twenty Two Million Dollars) and EBITDA of more than $3,633,333.00 (Three Million Six Hundred Thirty Three Thousand Three Hundred Thirty Three Dollars) but less than $4,300,000.00 (Four Million Three Hundred Thousand Dollars), then the contingent amount payable in respect of 2007 shall be the amount of EBITDA earned during 2007 in excess of $3,633,333.00 (Three Million Six Hundred Thirty Three Thousand Three Hundred Thirty Three Dollars).

(III)  For the year ending December 31, 2008, the contingent amount of $666,667 (Six Hundred Sixty Six Thousand Six Hundred Sixty Seven Dollars) will be paid if but only if the Buyer achieves net sales of $27,400,000.00 (Twenty Seven Million Four Hundred Thousand Dollars) and EBITDA of at least $4,300,000 (Four Million Three Hundred Thousand Dollars) during the year ending December 31, 2008.  In the event that for the year ended December 31, 2008 Buyer achieves net sales of at least $27,400,000.00 (Twenty Seven Million Four Hundred Thousand Dollars) and EBITDA of more than $3,633,333.00 (Three Million Six Hundred Thirty Three Thousand Three Hundred Thirty Three Dollars) but less than $4,300,000.00 (Four Million Three Hundred Thousand Dollars), then the contingent amount payable in respect of 2008 shall be the amount of EBITDA earned during 2008 in excess of $3,633,333.00 (Three Million Six Hundred Thirty Three Thousand Three Hundred Thirty Three Dollars).

(IV)  To the extent the Buyer earns more EBITDA during 2007 or 2008 than $4,300,000.00 (Four Million Three Hundred Thousand Dollars) and generates net sales of at least $22,000,000.00 (Twenty Two Million Dollars) during 2007 or $27,400,000.00 (Twenty Seven Million Four Hundred Thousand Dollars) during 2008, as applicable, and the maximum contingent amount in one or more prior years was not earned by the Sellers, then an additional amount will be payable in respect of 2007 and/or 2008, as applicable, up to the amount of the remaining shortfall from prior years to the extent the EBITDA exceeds

$4,300,000.00 (Four Million Three Hundred Thousand Dollars) for such 2007 or 2008 year.

(iv)     Upon a Change in Control, the persons listed in Annex II shall be entitled, as their interests may appear, to an aggregate amount equal to three percent of the following sum, when, as and if received: (a) the enterprise value of Buyer; (b) less all liabilities of the Buyer not assumed by such purchaser; and (d) less all costs of such transaction.

(b)     All amounts calculated hereunder shall be performed by the independent certified public accountants of the Buyer which shall be final and binding in the absence of fraud or manifest error.

(c)     Prior to the Closing, each Seller shall provide Buyer with a completed IRS Form W-9. Failure by a Seller to provide Buyer with the requisite document will result in the Buyer withholding of 30% of gross amount due to such noncompliant Seller and reporting such amount as provided in the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

1.5     Closing and Closing Date. Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been terminated pursuant to Section 9.1 hereof, and subject to the satisfaction of the conditions precedent contained herein, the closing (the "Closing") of the transactions herein contemplated shall take place on April 30, 2006, or at such other time and date prior to April 30, 2006 as the Sellers and the Buyer shall agree (such time and date being referred to herein as the "Closing Date"), at the offices of Adorno & Yoss, Suite 400, 2525 Ponce de Leon Blvd., Miami, Florida 33134, or at such other place as the Sellers and the Buyer shall agree. At the Closing, each of the parties hereto shall take, or cause to be taken, all such actions and deliver, or cause to be delivered, all such documents, instruments, certificates and other items as may be required under this Agreement or otherwise, in order to perform or fulfill all covenants and agreements on its part to be performed at or prior to the Closing Date.

1.6     Taking of Necessary Action; Further Action. Each of the parties shall use its respective reasonable best efforts to take all such action as may be necessary or appropriate in order to duly and timely effectuate the Closing. If, on or at any time after the Closing Date, any further reasonable action is necessary or desirable to carry out the purposes of this Agreement and to vest the Buyer with full right, title and possession to all of the Intellectual Property Rights, the Sellers shall take, and shall ensure that the officers of the Sellers are fully authorized, in the name of the Sellers or otherwise, to take, and shall take, all such lawful and necessary action.

Article 2.     Representations and Warranties of the Sellers.

The Sellers jointly and severally represent and warrant to the Buyer as follows:

2.1     Standing. Each of the Sellers have all requisite power and authority to enter into this Agreement, to execute and deliver this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The Sellers are of the age of majority, and are sui juris.



2.2     Binding Agreement.  This Agreement has been duly executed and delivered on behalf of the Sellers and, assuming the due authorization, execution and delivery by the Buyer, constitutes a legal, valid and binding obligation of each of the Sellers enforceable in accordance with its terms.  None of the spouses of the Sellers have community property, dower or similar rights that in any way restrict the Sellers from delivery and performance of the transactions contemplated hereby free and clear of any such rights.

2.3     Absence of Violations or Required Consents.  The execution, delivery and performance by the Sellers of this Agreement do not and will not (a) violate any Law or Governmental Order applicable to any of the Company or the Sellers or any of their respective properties or assets, (b) require any consent, approval, authorization or other order of, action by, registration or filing with or declaration or notification to any Governmental Authority or any other Person or (c) result in any violation or breach of, constitute a default (or event which with the giving of notice, or lapse of time or both, would become a default) under, require any consent under, or give to others any rights of notice, termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the Company's or the Sellers respective assets, or result in the imposition or acceleration of any payment, time of payment, vesting or increase in the amount of compensation or benefit payable, pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license or permit, or franchise to which any of the Company or the Sellers is a party or by which their respective assets are bound.  None of the Company nor the Sellers needs to give any notice to, make any filing with or obtain any authorization, consent or approval of any Government Entity in order for the parties to consummate the transactions contemplated by this Agreement.

2.4     Ownership of Intellectual Property Rights.

(a)     The Sellers are the record and/or beneficial owner of all of the Intellectual Property Rights, free and clear of any Encumbrances other than the Permitted Encumbrances and subject to no licenses or restriction on use other than as set forth on Schedule 2.4(a) hereto.

(b)     The Intellectual Property Rights include but are not limited to the items listed on Exhibit A hereto, and all of the patents, trademarks, copyrights, know-how, droit moral, show-how, mask work, proprietary innovations and inventions, methods or techniques or other intellectual property held by the Sellers or any of their Affiliates and used or useful, directly or indirectly, in the Business and any other matters within the scope of business of the Company whether or not reduced to writing.  There are no US or unpublished foreign filings owned or controlled by any of the Sellers or their Affiliates filed as of the date hereof or as of the Closing Date other than those listed on Exhibit A nor do any of the Sellers or their Affiliates have any present intentions to make any such filings.  If any of the Sellers or their Affiliates (including the Company) become aware of any Intellectual Property Rights prior to the Closing that are not set forth in writing they shall promptly notify the Buyer and cause such Exhibit A to be modified to include such additional Intellectual Property Rights.

(c)     This Agreement and the assignments made pursuant hereto (i) effectively convey all of the rights of the Sellers with respect to the Intellectual Property Rights, including but not limited to any claims by any of the Sellers or their affiliates against the Company and (ii)

includes all Intellectual Property Rights necessary to conduct the Business so currently conducted.

2.5     Title to Assets; Related Matters. (i) The Sellers have good, valid and marketable title to, the Intellectual Property Rights free and clear of all Encumbrances, and (ii) there are no contractual or legal restrictions to which any of the Sellers is a party or by which any Intellectual Property Rights is otherwise bound that preclude or restrict the Company's ability or subsequent to the Closing would restrict in any manner the Buyer's ability, to use the Intellectual Property Rights, other than as specified on Schedule 2.4(a) hereto. The Company enjoys peaceful and undisturbed possession of all Intellectual Property Rights. None of the Intellectual Property Rights are subject to any commitment or other arrangement for their sale or use by any Seller, their Affiliates or third parties.

2.6     Intellectual Property.

(a)     All of the Intellectual Property Rights are valid and subsisting and will provide the Buyer right to exclude all others from the use thereof and the Sellers are not, nor as a result of the execution and delivery of this Agreement or the performance by Sellers of their obligations hereunder will be to the best of Sellers' knowledge with reasonable diligence, in violation of the rights of any other parties. The Sellers own all right, title and interest to the Intellectual Property Rights and this Agreement, sufficient to vest in the Buyer all right, title and interest to the Intellectual Property Rights used in the Business without any further cost therefor as it exists as of the date hereof. Except as disclosed in Schedule 2.6(a), there have been no claims made against any of the Sellers or threatened or, to the knowledge of the Sellers, likely to be threatened by any Person, asserting the invalidity, misuse or unenforceability of any Intellectual Property Rights, or challenging the ownership, validity or effectiveness of any of the Intellectual Property Rights, or claiming that the Intellectual Property Rights or Sellers conduct of the Business infringes on any rights of any other Persons.

(b)     No Intellectual Property Right is subject to any Encumbrance and there is no fact that would render the Intellectual Property Rights invalid. No Intellectual Property Right is subject to any outstanding order, judgment, decree, stipulation or agreement restricting in any manner the licensing or exploitation thereof by the Sellers. The Sellers have not entered into any agreement to indemnify any other person against any charge of infringement, invalidity or any other claim relating to any Intellectual Property Right.

2.7     Commissions. With the exception of any responsibility that the Buyer has to PAC West Resources Group, whose fees will be paid by the Buyer, and any responsibility that the Sellers may have to Equity Management Group LLC, which will be paid by the Sellers, there is no broker or finder or other Person who has any valid claim against either of the Company, the Buyer, any of their respective Affiliates or any of their respective assets for a commission, finders' fee, brokerage fee or other similar fee in connection with this Agreement, or the transactions contemplated hereby, by virtue of any actions taken by on or behalf of the Sellers, or any of their respective Affiliates, officers, employees, independent contractors or agents.

2.8     Disclosure. No representation or warranty by the Sellers contained in this Agreement nor any statement or certificate furnished or to be furnished by or on behalf of the

Sellers or its representatives in connection herewith or pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading. There is no fact known to the Sellers that has not been disclosed by the Sellers or the Company to the Buyer that might reasonably be expected to have or result in a material adverse effect on the ownership or the exploitation of the Intellectual Property Rights.

Article 3.    Representations and Warranties of the Buyer.

The Buyer represents and warrants to the Sellers as follows:

3.1    Organization and Standing.  The Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Florida and has all requisite corporate power and authority to own, lease and operate its properties and assets and to conduct its business as it is now being conducted.

3.2    Binding Agreement.  The Buyer has all requisite corporate power and authority to enter into this Agreement, to execute and deliver this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by the Buyer and the consummation by the Buyer of its obligations hereunder have been duly and validly authorized by all necessary corporate and member action on the part of the Buyer. This Agreement has been duly executed and delivered on behalf of the Buyer and, assuming the due authorization, execution and delivery by the Sellers, constitutes a legal, valid and binding obligation of the Buyer enforceable in accordance with its terms.

3.3    Absence of Violations or Required Consents.  The execution, delivery and performance by the Buyer of this Agreement does not and will not: (a) violate or result in the breach or default of any provision of the articles of organization or Limited Liability Company Agreement of the Buyer; (b) violate any Law or Governmental Order applicable to the Buyer or any of its properties or assets; (c) except for the Required Consents, require any consent, approval, authorization or other order of, action by, registration or filing with or declaration or notification to any Governmental Authority or any other Person; or (d) result in any violation or breach of, constitute a default (or event which with the giving of notice, or lapse of time or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the Buyer's assets pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license or permit, or franchise to which the Buyer is a party or by which its assets are bound.

3.4    Litigation.  There are no Actions pending or threatened to be brought by or before any Governmental Authority, against the Buyer or any of its Affiliates that (i) seeks to question, delay or prevent the consummation of the transactions contemplated hereby, or (ii) would reasonably be expected to affect adversely the ability of the Buyer to fulfill its obligations hereunder, including without limitation, the Buyer's obligations under Article 1 hereof.

3.5    Commissions.  With the exception of any responsibility that the Buyer has to PAC West Resources Group, whose fees will be paid by the Buyer, and any responsibility that the

[1.3.1] [Stock Purchase Agreement - Master.pdf] [Page 353 of 425]

Sellers may have to Equity Management Group LLC, which will be paid by the Sellers. There is no broker or finder or other Person who has any valid claim against the Sellers, any of their respective Affiliates or any of their respective assets for a commission, finders' fee, brokerage fee or other similar fee in connection with this Agreement, or the transactions contemplated hereby, by virtue of any actions taken by on or behalf of the Buyer or its officers, employees or agents.

3.6     Disclosure. No representation or warranty by the Buyer contained in this Agreement nor any statement or certificate furnished or to be furnished by or on behalf of the Buyer or its representatives in connection herewith or pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading. There is no fact known to the Buyer that has not been disclosed by the Buyer to the Sellers that might reasonably be expected to have or result in a material adverse effect on the ownership or the exploitation of the Intellectual Property Rights.

Article 4.     Covenants and Agreements.

4.1     Conduct of the Sellers Prior to Closing; Access. The Sellers covenant as follows:

(a)     Between the date hereof and the Closing Date, except as contemplated by this Agreement, or except with the prior written consent of the Buyer, the Sellers:

(i)     will not permit any of the Intellectual Property Rights to be licensed or otherwise to be subjected to any Encumbrance;

(ii)     will not permit any of the Intellectual Property Rights to be sold, transferred, leased, subleased, licensed, encumbered or otherwise disposed of (including, without limitation, sales, transfers, leases, subleases, licenses or dispositions to any Affiliates of the Sellers;

(iii)     will immediately notify the Buyer of any publications, office actions, objections or interferences with respect to any filings; and

(iv)     will cooperate in the filing and execution of any and all documents necessary to effectuate the assignment to the Buyer of the Intellectual Property Rights, including the filing of assignments or other transfer of the title covenants with the U.S. Patent and Trademark Office and foreign patent offices as applicable to the Intellectual Property Rights. Prior to the Closing, Sellers will notify all attorneys handling the prosecution of the Intellectual Property Rights to continue such efforts for the benefit of the Buyer following the Closing and prior to the Closing to provide a status update on the Intellectual Property Rights and to prepare the documents necessary to transfer the Intellectual Property Rights to the Buyer. The cost of recording assignments of the Intellectual Property Rights will be borne by the Buyer. Not later than five business days to the Closing Date, the Sellers and their Affiliates will transfer all files and supporting documents relating to the Intellectual Property Rights to the Buyer, including but not limited to, all initial invention disclosure documents, all documents sent to the U.S. Patent and Trademark Office regarding inventions and claims, all draft patent applications, all filing or prosecution documents submitted to the patent offices, and all

{M1429618_15}                                   9

file wrappers. Conception notebooks and all other documents in the possession or under the control of Sellers or their counsel relating to conception and/or reduction to practice, such as notebooks shall be obtained and made available to Buyer.

4.2     Cooperation. Following the execution of this Agreement, the Buyer and the Sellers agree as follows:

(a)     Subject to the terms and conditions of this Agreement, each party will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable, including under applicable Laws and regulations, to consummate the Assignment and the other transactions contemplated by this Agreement on the Closing Date. In furtherance and not in limitation of the foregoing, each party hereto agrees to use its reasonable best effort to obtain as soon as practicable all other required consents from third parties.

(b)     As used in this Section 4.2, "reasonable best efforts" shall not require the Buyer or any of its Affiliates to divest or hold separate or otherwise take or commit to take any action that limits their freedom of action with respect to, or their ability to retain, any of their assets or businesses or the Business or assets or that limits their freedom of action with respect to their business or assets.

4.3     Confidentiality.

(a)     Prior to the Closing Date. The terms of the Confidentiality Agreement are herewith incorporated by reference and shall continue in full force and effect with respect to the Buyer until the Closing Date and shall remain in effect in accordance with its terms even if this Agreement is terminated.

(b)     After the Closing Date, the Sellers shall maintain the confidentiality of all information associated with the Intellectual Property Rights similar to those set forth in the Confidentiality Agreement with respect to "Information" as though such terms applied to the Sellers and continued after the Closing Date.

4.4     Public Announcements. Except as otherwise required by law or the rules of any stock exchange or automated quotation system, the parties shall not issue any report, statement or press release or otherwise make any public announcement with respect to this Agreement and the other transactions contemplated hereby without prior consultation with and approval of the other parties hereto (which approval shall not be unreasonably withheld); provided, that, the Buyer shall be entitled to disclose the acquisition of the Intellectual Property Rights after the Closing.

4.5     No Solicitation. The Sellers shall not (a) initiate contact with, solicit, encourage or respond to any inquiries or proposals by, or (b) enter into any discussions or negotiations with, or disclose, directly or indirectly, any information concerning the Intellectual Property Rights to, or afford any access to the Intellectual Property Rights, or to the books and records relating thereto, any Person in connection with any possible proposal for the acquisition (directly or indirectly), of all or any of the Intellectual Property Rights.

Article 5.        Conditions to Obligations of the Buyer.

The obligations of the Buyer to consummate the transactions contemplated by this Agreement are, at its option, in its sole discretion, subject to satisfaction of each of the following conditions:

5.1      Representations and Warranties.

(a)      The representations and warranties of the Sellers contained herein shall be true and correct in all material respects (other than those representations and warranties that are qualified by Material Adverse Effect and those described in clause (b) below, which shall be true and correct in all respects) at and as of the Closing Date as though each such representation and warranty were made at and as of such time, other than such representations and warranties as are made as of a specific date.

(b)      The representations and warranties of the Seller Parties contained in Sections 2.3, 2.4, 2.5, and 2.6, shall be true and correct in all respects at and as of the Closing Date.

5.2      Performance by the Sellers. All of the covenants and agreements to be complied with and performed by the Sellers on or before the Closing Date shall have been complied with or performed in all material respects.

5.3      Certificate. The Sellers shall have delivered to the Buyer a certificate, dated as of the Closing Date, executed on behalf of the Sellers to the effect of Sections 5.1 and 5.2.

5.4      Consents; No Objections. All consents, waivers, approvals, orders and authorizations from third parties required to be made or obtained for the authorization, execution, delivery and performance of this Agreement, the consummation of the transactions contemplated hereby and the continuation in force of any rights, of the Intellectual Property Rights shall have been obtained and become final and non-appealable. Neither any statute, rule, regulation, order, stipulation, decree, judgment, or injunction shall be enacted, promulgated, entered, enforced, or deemed application to the purchase nor any other action shall have been taken by any Government Entity (i) which prohibits the consummation of the transactions contemplated by this Agreement; (ii) which prohibits Buyer's ownership or operation of all or any portion of the Intellectual Property Rights, or which compels the Buyer to dispose of or hold separately all or any portion of the Buyer's business or assets as a result of the transaction contemplated herein; (iii) which makes the purchase of, or payment for, some or all of the Intellectual Property Rights illegal; or (iv) which imposes material limitations on the ability of the Buyer to acquire or hold or to exercise effectively all rights of ownership of the Intellectual Property Rights.

5.5      No Proceedings or Litigation. There shall not have been instituted, pending or threatened any action or proceeding (or any investigation or other inquiry that might result in such an action or proceeding) by or before any Government Entity (i) which prohibits the consummation of the transactions contemplated by this Agreement; (ii) which prohibits Buyer's ownership or operation of any of the Intellectual Property Rights, or which compels the Buyer to dispose of or hold separately all or any portion of the Buyer's business or assets as a result of the transaction contemplated herein; (iii) which makes the purchase of, or payment for, any of the

{M1429618_15}                                11

Intellectual Property Rights illegal; (iv) which imposes limitations on the ability of the Buyer to acquire or hold or to exercise effectively all rights of ownership of any of the Intellectual Property Rights; or (v) which imposes any limitations on the ability of the Buyer effectively to control in any material respect the business or operations of the Company. No preliminary or permanent injunction or other order issued by any United States federal or state Governmental Authority, nor any Law promulgated or enacted by any United States federal or state Governmental Authority, that restrains, enjoins or otherwise prohibits the transactions contemplated hereby or limits the ability in any respect of the rights of the Buyers to hold its assets and conduct its present, planned or prospective business, or imposes civil or criminal penalties on any stockholder, director or officer of the Buyer if such transactions are consummated, shall be in effect.

5.6     No Events.  Since the date hereof, there have not been any adverse circumstances, changes in or effects on the Intellectual Property Rights.

5.7     Asset Purchase Closing.  All conditions to the Closing of the Asset Purchase Agreement shall have been satisfied.

5.8     Opinion of Cousel.  Hooper, Englund & Weil LLP, counsel to the Sellers, shall have delivered to the Buyer an opinion letter, dated the date of the Closing in form and content acceptable to the Buyer, addressed to the Buyer and its lenders.

5.9     Miscellaneous.  The Sellers shall deliver to the Buyer addressed to the Buyer and its lenders, dated the Closing Date, such additional certificates and opinions as the Buyer shall reasonably request.

Article 6.     Conditions to Obligations of the Sellers.

The obligations of the Sellers to consummate the transactions contemplated by this Agreement are, at its option, in its sole discretion, subject to satisfaction of each of the following conditions:

6.1     Representations and Warranties.  The representations and warranties of the Buyer contained herein shall be true and correct in all material respects (other than those representations and warranties that are qualified by Material Adverse Effect, which shall be true and correct in all respects) at and as of the Closing Date as though each such representation and warranty were made at and as of such time, other than such representations and warranties as are made as of a specific date, in each case except for changes that are expressly contemplated by this Agreement, and except for such failures to be true and correct that (without regard to materiality concepts therein once such failure is established) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the business, results of operations or financial condition of the Buyer.

6.2     Performance by the Buyer.  All of the covenants and agreements to be complied with and performed by the Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects.

6.3     Certificate.  The Buyer shall have delivered to the Sellers a certificate, dated as of the Closing Date, executed on behalf of the Buyer by its duly authorized officers to the effect of Sections 6.1 and 6.2.

6.4     No Proceedings or Litigation.  No preliminary or permanent injunction or other order issued by any United States federal or state Governmental Authority, nor any Law promulgated or enacted by any United States federal or state Governmental Authority, that restrains, enjoins or otherwise prohibits the transactions contemplated hereby.

Article 7.     Indemnification.

7.1     Indemnification by the Sellers.  Subject in all respects to the provisions of this Article 7, the Sellers hereby agree jointly and severally to indemnify and hold harmless the Buyer and its Affiliates, officers, directors, employees, agents, representatives, successors and assigns, after the Closing Date from and against any Claims and Damages incurred by them arising out of or resulting from:

(a)     any breach on the part of any of the Sellers, or the Company or any Seller Parties (as defined in the Asset Purchase Agreement) of (i) any representation or warranty made herein or in the Asset Purchase Agreement or in any certificate delivered by the Sellers or the Company or any Seller Parties (as defined in the Asset Purchase Agreement) pursuant to this Agreement or the Asset Purchase Agreement or (ii) any covenant or agreement made by any of the Sellers or the Company  or any Seller Parties (as defined in the Asset Purchase Agreement) in this Agreement or in the Asset Purchase Agreement; or

(b)     any third party claim existing as of the Closing Date, or any dispute initiated by the Company prior to the Closing, and any third party claim initiated following the Closing arising out of any event that occurred at or prior to the Closing, in each case including those in which the Company is a plaintiff.

(c)     any claim made by any Person at any time arising out of acts or omissions of, or products sold by, any licensees of the Sellers or any of their Affiliates other than the product lines conveyed herein or in the Asset Purchase Agreement for full exploitation by the Buyer.

(d)     any claim made by any Person at any time alleging or based on an allegation that at any time prior to Closing any of the Intellectual Property Rights were invalid, infringed the rights of other parties, or at anytime prior to Closing were procured, utilized or enforced in an improper or illegal manner (claims within the scope of (b) – (d) are "Liability Claims").

7.2     Indemnification by the Buyer.  Subject in all respects to the provisions of this Article 7, the Buyer hereby agrees to indemnify and hold harmless the Sellers and their respective Affiliates, officers, directors, employees, agents and representatives after the Closing Date from and against any Claims and Damages incurred by them arising out of or resulting from any breach on the part of the Buyer of (i) any representation or warranty made by the Buyer in Article 3 hereof or in any certificate delivered pursuant to this Agreement or (ii) any covenant or

agreement made by the Buyer in this Agreement; and (iii) any claims against the Sellers arising out of the conduct of the business of the Buyer following the Closing.

      7.3     Limitations on Indemnification Claims and Liability.

      (a)     The respective representations and warranties of the Sellers and the Buyer set forth in this Agreement or in any certificate delivered pursuant to this Agreement, and the opportunity to make a claim for indemnification, or otherwise be indemnified or held harmless, under this Article 7 with respect thereto or with respect to (i) any covenant or agreement relating to any action required by this Agreement to be taken prior to or at the Closing or (ii) any Liability Claim shall survive until a final, unappealable order is entered with respect to such Liability Claim and indemnification is made by the Sellers as provided herein; provided, however, that any claim based on a breached representation or warranty is made prior to the third anniversary of the Closing. Any and all covenants and agreements relating to any action required by this Agreement to be taken after the Closing shall survive the Closing for the applicable period of the statutes of limitations and shall not expire with, and be terminated and extinguished upon, the Closing.

      (b)     The Sellers shall not be obligated to indemnify or hold harmless any Indemnified Party under Section 7.1 (i) for any Claims or Damages incurred by such Indemnified Party in connection with any individual occurrence or related series of occurrences unless and until Claims or Damages in respect of the indemnification obligations of the Seller Parties under Section 7.1 exceed in the aggregate $10,000, together with the indemnification obligations of the Sellers under Section 7.1 of the Asset Purchase Agreement, following which the Sellers shall be obligated to indemnify or hold harmless an Indemnified Party for all Claims or Damages arising hereunder and under the Asset Purchase Agreement.

      (c)     Notwithstanding anything to the contrary in this Agreement, the indemnifications in Sections 7.1 and 7.2 hereof will be the sole and exclusive remedies available to the Buyer or the Sellers, or any of their respective Affiliates, officers, directors, employees, agents or representatives, after the Closing for breaches of any representations or warranties in this Agreement, or any certificate delivered pursuant to this Agreement. Any claim for indemnification must be made as provided in Sections 7.5 and 7.6 hereof.

      (d)     Once a claim for indemnification has been made under this Article 7, each Indemnified Party may, as one of its remedies to effect indemnification under this Article 7, withhold or cause to be withheld and setoff any amounts payable (under this Agreement or otherwise) following the Closing to the Indemnifying Party. The right to setoff will be exercisable whether the claim for indemnification is liquidated or unliquidated, whether or not the claim for indemnification has been reduced to judgment, and regardless of any difficulty or uncertainty in determining or computing the ultimate amount of the indemnification claim. The exercise of a right of setoff in good faith, whether or not ultimately deemed to be justified, will not constitute a default of any obligation against which such setoff is made. Any amount withheld by an Indemnified Party in setoff and which is ultimately determined not to be payable by the Indemnifying Party will be promptly paid to the Indemnifying Party.

[1.3.1] [Stock Purchase Agreement - Master.pdf] [Page 359 of 425]

7.4     Computation of Claims and Damages.  Whenever an Indemnifying Party is required to indemnify and hold harmless an Indemnified Party from and against and hold the Indemnified Party harmless from, or to reimburse the Indemnified Party for, any item of Claim or Damage under this Agreement, the Indemnifying Party will, subject to the provisions of this Article 7, pay the Indemnified Party the amount of the Claim or Damage reduced by (i) any amounts to which the Indemnified Party actually recovers from third parties in connection with such Claim or Damage ("Reimbursements"), and reduced by (ii) the Net Proceeds of any insurance policy payable to the Indemnified Party with respect to such Claim or Damage.  For purposes of this Section 7.4, "Net Proceeds" shall mean the insurance proceeds actually paid, less any deductibles, co-payments, premium increases, retroactive premiums or other payment obligations (including attorneys' fees and other costs of collection) that relates to or arises from the making of the claim for indemnification.  If any Indemnified Party receives any Reimbursement or Net Proceeds after an indemnification payment is made which relates thereto, the Indemnified Party shall promptly repay to the Indemnifying Party such amount of the indemnification payment as would not have been paid had the Reimbursement or Net Proceeds reduced the original payment (and any such repayment shall be a credit against any applicable indemnification threshold or limitation set forth in Section 7.3(b) hereof) at such time or times as and to the extent that such Reimbursement or Net Proceeds is actually received.  The Indemnified Party shall make available to the Indemnifying Party and its agents and representatives all pertinent records, materials and information, and provide reasonable access during normal business hours to the Indemnified Party's employees, properties, books and records, and shall otherwise cooperate with and assist the Indemnifying Party and its agents and representatives in reviewing the propriety and the amount of any Claims or Damages, including, without limitation, the availability and/or amounts of Reimbursements and Net Proceeds.

7.5     Notice of Claims.  Upon obtaining actual knowledge of any Claim or Damage which has given rise to, or could reasonably give rise to, a claim for indemnification hereunder, the party seeking indemnification (the "Indemnified Party") shall, as promptly as reasonably practicable (but in no event later than 30 days) following the date the Indemnified Party has obtained such knowledge, give written notice (a "Notice of Claim") of such claim to the  party or parties from which indemnification is or will be sought under this Article 7 (the "Indemnifying Party").  The Indemnified Party shall furnish to the Indemnifying Party in good faith and in reasonable detail such information as the Indemnified Party may have with respect to such indemnification claim (including copies of any summons, complaint or other pleading which may have been served on it and any written claim, demand, invoice, billing or other document evidencing or asserting the same).  No failure or delay by the Indemnified Party in the performance of the foregoing shall reduce or otherwise affect the obligation of the Indemnifying Party to indemnify and hold the Indemnified Party harmless, except to the extent that such failure or delay shall have materially adversely affected the Indemnifying Party's ability to defend against, settle or satisfy any liability, damage, loss, claim or demand for which such Indemnified Party is entitled to indemnification hereunder.

7.6     Survival.  Claims for indemnification under this Agreement based on breached representations or warranties shall survive until the third anniversary of the Closing and other claims for indemnification under this Agreement shall survive until the expiration of the applicable statute of the limitations (including any extensions or waivers of such statutes).

Article 8.    Definitions.

Unless otherwise stated in this Agreement, the following capitalized terms have the following meanings:

"Action" means any action, suit, claim, arbitration, or proceeding or investigation commenced by or pending before any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person.

"Agreement" or "this Agreement" means this Intellectual Property Rights Assignment Agreement dated as of the date first above written (including the Annexes, Schedules and Exhibits hereto) and all amendments hereto made in accordance with the provisions of Section 9.17 hereof.

"Business" has the meaning set forth in the Recitals hereto.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of Tampa, Florida.

"Buyer" has the meaning specified in the introductory paragraph to this Agreement.

"Cash Payment" has the meaning set forth in Section 1.3 hereof.

"Change in Control" means and occurs upon (i) the closing date relative to a plan of liquidation of Buyer or a plan or agreement for the direct or indirect sale or other disposition of more than 50% of the assets of the Buyer; or (ii) the effective date of a merger, reorganization, consolidation, or similar transaction (a "Merger") as a result of which the Members of Buyer immediately before the Merger are not expected to own, immediately after the Merger, directly or indirectly more than 50% of the membership interests in the Buyer.

"Claims and Damages" means, except as otherwise expressly provided in this Agreement, any and all losses, claims, demands, liabilities, obligations, actions, suits, orders, statutory or regulatory compliance requirements, or proceedings asserted by any Person (including, without limitation, Governmental Authorities), and all damages, costs, expenses, assessments, judgments, recoveries and deficiencies, including, to the extent required pursuant to Article 8, reasonable attorneys', experts' and paralegals' fees and costs, whether prior to the filing of proceedings, during proceedings and through all appellate levels, incurred by or awarded against a party to the extent indemnified in accordance with Article 7 hereof, but shall not include any consequential, special, multiple, punitive or exemplary damages, except to the extent such damages have been recovered by a third party and are the subject of a third party claim for which indemnification is available under the express terms of Article 7 hereof.

"Closing" has the meaning set forth in Section 1.5 hereof.

"Closing Date" has the meaning set forth in Section 1.5 hereof.

[1.3.1] [Stock Purchase Agreement - Master.pdf] [Page 361 of 425]

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Recitals hereof.

"Confidentiality Agreement" means that certain Standard Buyer's Confidentiality and Warranty Agreement dated August 22, 2005 signed by Equitable Capital Management LLP.

"Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or to cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"Deposit" has the meaning set forth in Section 1.4 hereof.

"EBITDA" means the net income of the Buyer determined in accordance with GAAP, plus a sum equal to:

    (i)    interest;

    (ii)    income taxes;

    (iii)    depreciation and amortization;

    (iv)    management fees payable to the Managers or Members of the Buyer as defined in the Limited Liability Company Agreement;

    (v)    amounts prior to the Closing paid by Traeger Industries, Inc. for:

        (A)    license fees paid to the Sellers in accordance with past practices;

        (B)    rental of equipment in the amount not to exceed $3,000.00 (Three Thousand Dollars) per month payable to Joe Traeger;

        (C)    legal and accounting fees directly related to the negotiation and preparation of this Agreement and the other agreements contemplated hereby;

        (D)    perquisites of the shareholders of Traeger Industries, Inc. not to exceed $47,000.00 (Forty Seven Thousand Dollars) on an annualized basis;

        (E)    moving expenses directly for the move of the headquarters office of Traeger Industries, Inc. not to exceed $25,000.00 ( Twenty Five Thousand Dollars);

    (vi)    compensation of the new CEO, VP Operations or VP Finance of the Buyer in excess of $430,000.00 (Four Hundred Thirty Thousand Dollars) combined per annum;

{M1429618_15}

(vii)    any selling, general and administrative expense in excess of 16.6% of net sales of the Buyer after reducing selling, general and administrative expense by an amount equal to the excess over $430,000.00 per annum of the compensation of the new CEO, VP Operations and VP Finance as provided for in clause (vi) above;

(viii)    any penalty under Section 4.10 of the Asset Purchase Agreement; and

(ix)    any non-recurring items of income, gain, expense or loss.

"Encumbrance" means any security interest, pledge, mortgage, lien (including, without limitation, tax liens), charge, encumbrance, easement, adverse claim, preferential arrangement, restriction or defect in title.

"Escrow Agent" means Powers, McCulloch & Bennett LLP.

"Escrow Agreement" means that certain Escrow Agreement, dated of even date herewith, among the Buyer, the Sellers and the Escrow Agent.

"GAAP" means United States generally accepted accounting principles and practices as in effect from time to time.

"Governmental Authority" means any United States federal, state or local government or any foreign government, any governmental, regulatory, legislative, executive or administrative authority, agency or commission or any court, tribunal, or judicial body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.  Governmental Orders shall not include Permits.

"Indemnified Party" has the meaning set forth in Section 7.5 hereof.

"Indemnifying Party" has the meaning set forth in Section 7.5 hereof.

"Intellectual Property Rights" include but are not limited to the items listed on Exhibit A hereto and all of the patents, applications, trademarks, copyrights, know-how, droit moral, show-how, mask work, proprietary innovations and inventions, methods or techniques, likenesses or other intellectual property held by the Sellers or any of their Affiliates and used or useful, directly or indirectly, in the Business and any other matters within the scope of business of the Company whether or not reduced to writing.

"Knowledge" with respect to a party means such information as any of its officers or key employees actually knew or should with the exercise of due diligence have known.

"Law" means any federal, state, local or foreign constitution, statute, law, ordinance, regulation, rule, code, injunction, judgment, order, decree or other requirement, restriction or rule of law.

"Liability Claim" means claims within the scope of Section 7.1 (b) – (d) hereof.

"Material Adverse Effect" means any circumstance, change in, or effect on the Company that has a material adverse effect on the business, results of operations, condition (financial or otherwise), or prospects of the Company.

"Notice of Claim" has the meaning set forth in Section 7.5 hereof.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Purchase Price" has the meaning set forth in Section 1.3 hereof.

"Regulatory Law" has the meaning set forth in Section 4.4(b).

"Required Consents" means the consents, approvals, orders, authorizations, registrations, declarations and filings required.

"Seller Parties" has the meaning set forth in the introductory paragraph of this Agreement.

"Sellers" has the meaning set forth in the introductory paragraph to this Agreement.

Article 9.       Miscellaneous Provisions.

9.1       Termination Rights.

(a)       Grounds for Termination.  This Agreement may be terminated:

(i)       by mutual consent of the parties;

(ii)       by the Sellers if the Sellers are ready, willing and able to close the transactions contemplated hereby and by the Asset Purchase Agreement on the Closing Date, the Sellers and  Traeger Industries, Inc. have not violated their representations, warranties or covenants herein or in the Asset Purchase Agreement and have satisfied the Closing conditions herein and in the Asset Purchase Agreement, and Buyer is not prepared to close on the Closing Date;

(iii)       by the Buyer if the Sellers are not ready, willing and able to close the transactions contemplated hereby and by the Asset Purchase Agreement on the Closing Date, or any of the Sellers or Traeger Industries, Inc. have violated their representations, warranties or covenants herein or in the Asset Purchase Agreement or have not satisfied the conditions to the Closing herein or in the Asset Purchase Agreement and the Buyer is prepared to close on the Closing Date;



      (iv)    by either the Sellers or the Buyer, upon written notice to the other party or parties, if any Governmental Authority shall have issued a statute, rule, regulation, order, decree or injunction or taken any other action permanently restraining, enjoining or otherwise prohibiting the purchase and sale contemplated by this Agreement and such statute, rule, regulation, order, decree or injunction or other action shall have become final and nonappealable;

      (v)    by the Buyer, if there has been a breach of any representation or warranty of the Sellers set forth in this Agreement or if there has been a material breach by any of the Sellers of their covenants and agreements set forth in this Agreement; or

      (vi)    by the Sellers, if there has been a breach of any representation or warranty of the Buyer set forth in this Agreement or if there has been a material breach by the Buyer of its covenants and agreements set forth in this Agreement.

      (b)    Post-Termination Liability.  If this Agreement is terminated pursuant to Subsection 9.1(a) hereof, this Agreement shall thereupon become void and of no further effect whatsoever, and the parties shall be released and discharged of all obligations under this Agreement, except (i) to the extent of the Deposit under the circumstances described in Section 1.4, which shall be the sole and exclusive remedy of the Sellers under such circumstances, (ii) to the extent of a Parties' liability for willful material breaches of this Agreement prior to the time of such termination, (iii) as set forth in Section 4.3 hereof, and (iv) the obligations of each party for its own expenses incurred in connection with the transactions contemplated by this Agreement as provided herein.

      9.2    Expenses.  Except as otherwise specifically provided in this Agreement, all out-of-pocket costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by whichever is the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

      9.3    Notices.  Any notice, demand, claim, notice of claim, request or communication required or permitted to be given under the provisions of this Agreement shall be in writing and shall be deemed to have been duly given (i) upon delivery if delivered in person, (ii) on the date of mailing if mailed by registered or certified mail, postage prepaid and return receipt requested, (iii) on the date of delivery to a national overnight courier service, or (iv) upon transmission by facsimile (if such transmission is confirmed by the addressee) if delivered through such services to the following addresses, or to such other address as any party may request by notifying in writing all of the other parties to this Agreement in accordance with this Section 9.3.



If to the Buyer:

> Traeger Pellet Grills LLC
> 601 North Ashley Drive
> Suite 1200
> Tampa, Florida 33602
> Attn:  Albert E. Strausser
> Telephone:  813-226-3900
> Facsimile:  813-226-3995

With a copy to:

> Adorno & Yoss
> 2525 Ponce de Leon Blvd.
> Suite 400
> Miami, FL  33134
> Attention: Seth P. Joseph, Esq.
> Telephone: (305) 460-1469
> Facsimile: (305) 328-4024

If to the Sellers:

> Traeger Industries, Inc.
> P.O. Box 1070
> 530 Alder Street
> Mt. Angel, Oregon 97362
> Attn:  Joe Traeger
> Telephone:  (503) 845-6495
> Facsimile:  (503) 845-6366

With a copy to:

> Hooper, Englund & Weil LLP
> 1100 SW 6th Avenue, Suite 1507
> Portland, Oregon 97204
> Attn:  Gregory J. Englund
> Telephone:  (503) 226-0500
> Facsimile:  (503) 226-7192

Any such notice shall be deemed to have been received on the date of personal delivery, the date set forth on the Postal Service return receipt, or the date of delivery shown on the records of the overnight courier, as applicable.

    9.4    Benefit and Assignment.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  There shall be no assignment of any interest under this Agreement by any party except that the Buyer may assign its rights hereunder to any wholly owned subsidiary of the Buyer of any purchaser of the

{M1429618_15}

21

Business, in whole or in part; provided, however, that no such assignment shall relieve the assignor of its obligations under this Agreement. Nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.5     Waiver. Any party to this Agreement may (a) extend the time for the performance of any of the obligations or other acts of any other party, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered by any other party pursuant hereto or (c) waive compliance with any of the agreements or conditions of any other party contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition, of this Agreement. The failure of any party to assert any of its rights hereunder shall not constitute a waiver of any such rights.

9.6     Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

9.7     Amendment. This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Sellers and the Buyer or (b) by a waiver in accordance with Section 9.5 hereof.

9.8     Effect and Construction of this Agreement. This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior agreements, arrangements and understandings, whether written or oral, relating to matters provided for herein; provided, however, that the Confidentiality Agreement shall remain in effect until the Closing. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual agreement, and this Agreement shall not be deemed to have been prepared by any single party hereto. The headings of the sections and subsections of this Agreement are inserted as a matter of convenience and for reference purposes only and in no respect define, limit or describe the scope of this Agreement or the intent of any section or subsection. This Agreement may be executed in one or more counterparts and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Florida, applicable to contracts executed in and to be performed entirely within that State. The parties agree that the exclusive venue for any dispute concerning the entitlement to the Deposit shall be the courts of competent jurisdiction situated in

[1.3.1] [Stock Purchase Agreement - Master.pdf] [Page 367 of 425]

Portland, Oregon and that the exclusive venue for any other dispute between the parties (except those arising from a third party claim) shall be Hillsborough County, Florida.

9.9 **Specific Performance.** Each of the Sellers acknowledges and agrees that in the event of any breach of this Agreement, the Buyer would be irreparably and immediately harmed and could not be made whole by monetary damages. It is accordingly agreed that the parties hereto (i) waive, in any action for specific performance, the defense of adequacy of a remedy at law and (ii) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BUYER:

Traeger Pellet Grills LLC

By: _____
Name:  Albert Strausser
Title:  Managing Director of The Barish Fund LLC, as
        Managing Member of Traeger Pellet Grills LLC

SELLERS:

_____
Joe Traeger

_____
Brian Traeger

_____
Mark Traeger

_____
Randy Traeger

## Annex I

### Allocation of Purchase Price Among Sellers

**Cash at Closing:**

| | |
|---|---|
| Joe Traeger: | $2,842,000 |
| Randy Traeger: | $2,747,000 |
| Mark Traeger: | $2,747,000 |
| Brian Traeger: | $664,000 |
| Total: | $9,000,000 |

**Contingent Amount:**

| | Joe Traeger | Randy Traeger | Mark Traeger | Brian Traeger | Total |
|---|---|---|---|---|---|
| 2006 | $133,333 | $133,333 | $133,333 | $266,667 | $666,666 |
| 2007 | $133,333 | $133,333 | $133,333 | $266,668 | $666,667 |
| 2008 | $133,334 | $133,334 | $133,334 | $266,665 | $666,667 |

## Annex II

## Allocation of Phantom Equity

100% of the Phantom Equity will be allocated to Brian Traeger.

## Schedule 2.4(a)

### Permitted Encumbrances

**Permitted Encumbrances**

Liens in connection with the following equipment lease agreements:
- Silver Falls Bank UCC filing dated march 17, 2005 on "All inventory, Equipment and General Intangibles; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds)" pursuant to a note payable and line of credit which shall be discharged at closing.
- De Lage Landen forklift capital lease
- Norlift new forklift capital lease/purchase agreement
- First Data lease of three visa machines
- IOS Capital lease of two copiers
- Pitney Bowes lease of postage machine

All Distributors and Dealers are authorized in the use of the Traeger name and logo, and related marketing elements, in the ordinary course of advertising and promoting of products.

Cookshack is authorized, through a commercial license agreement as disclosed in Material Contracts Schedule 2.11, in the use of the Traeger name and logo, and related manufacture and marketing of commercial products, and in utilizing of certain Intellectual Property (of which the Sellers shall have served termination notice prior to Closing).

Pinnacle is authorized, through a license agreement unrelated to the Business, in the use of the Traeger name and logo, and related manufacture and marketing of pellet fired furnaces and boilers.

## <u>Exhibit A</u>

### IP Descriptions

All the patents, patent rights, proprietary info and projects, trade secrets, personal goodwill and IP assets and properties used or usable in the business, including but not limited to the following:

**[Seller's IP counsel to update schedule prior to closing, including status of patent applications, office actions, objections etc (if any)]**

- Traeger name and tree logo (which Seller is assigning including any rights to register, in connection with the Business only)
- Smokeman-TII 2,987,301
- Design Patent 370,823 (pig design)
- Patent 4,823,684 (Pellet-Fired Barbecue grill)
- Patent 4,989,521 (Gravity Fed Pellet Burner)
- Patent Applications:
    o US—10/924,430—flavored wood pellet with wood oil
    o Canada 2,521,734-flavored wood pellet with wood oil
    o US THH314—smoke generator
    o US THH315—pellet fired BBQ
    o US THH316—burner design
- Any other marks, logos, copyrights or other intellectual property used in connection with the Business, including without limitation likenesses of people and images used in advertising (who shall sign documentation allowing the Buyer to continue to use the likenesses without cost and deliver said documentation to Seller at Closing), packaging and labeling, artwork used on Business products, product names, including without limitation BBQ070, 075, LHS, PIG, 100, 124, 125, and SW, Traeger Professional, Traeger Executive, Commercial Models, "Lil Pig", "Longhorn Steer" , formulations for shakes, sauces, rubs, samplers, pellets, designs, tooling, masters, stats, dies, photos, TV programs including names, formats, rights, videotapes or films, design, masters, layout, of instruction manuals, training aids and material, video and film productions, cookbooks, recipes

Domain names including traegerindustries.com or any other domain name used or registered by the Business, whether or not currently registered using the name "Traeger"

<u>**Schedule 2.6(a)**</u>

**IP Claims**

Graybeal Jackson Haley LLP, on behalf of the Danson's Group Inc. sent a letter (known by Seller and Buyer as the "Dansons letter") dated December 15, 2004 alleging "false marking" of Traeger's product under patent 4,823,684. This letter has been provided to the Buyer during due diligence.