UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRAEGER PELLET GRILLS LLC, a
Delaware limited liability company,

      Plaintiff,

v.                                                                                    Case No:  8:19-cv-1714-AEP

JOSEPH TRAEGER, an individual, BRIAN
TRAEGER, an individual, and MARK
TRAEGER, an individual,

      Defendants.

                                    /

## ORDER

      This matter comes before the Court upon Plaintiff Traeger Pellet Grills LLC's ("Traeger Grills") Motion for Preliminary Injunction (Doc. 6) and the response in opposition thereto (Doc. 41). The undersigned subsequently conducted a hearing on the Motion for Preliminary Injunction on August 26, 2019. For the reasons that follow, the Motion for Preliminary Injunction (Doc. 6) is denied.

## BACKGROUND

      Traeger Grills brought this action for injunctive relief, damages for breach of contract, contractual indemnification, breach of the covenant of good faith and fair dealing, violation of the right of publicity under Fla. Stat. §540.08, contributory infringement under 35 U.S.C. § 1114(1), contributory false designation of origin under 35 U.S.C. § 1125(a), and willful violation of Florida Stats. §501 and 204 (Doc. 1). Specifically, Traeger Grills brought this action for injunctive relief against Defendants Joe Traeger and Brian Traeger[1] under Count I-Breach

---

[1] Though the Complaint seeks relief against Mark Traeger as well, Plaintiff's Motion for Preliminary Injunction solely seeks relief against Joe Traeger and Brian Traeger (Docs. 1, 6).

of Contract (against Joe Traeger), Count II-Breach of Contract (against Brian Traeger), Count VII-Violation of the Right of Publicity (against Joe Traeger), and Count VIII-Violation of the Right of Publicity (against Brian Traeger). Traeger Grills seeks an injunction precluding the Defendants from continuing the alleged unauthorized use of their names, likenesses, and personal goodwill to promote Traeger Grills' competitor Dansons US LLC ("Dansons") and its grill products, which Traeger Grills alleges has and will continue to cause consumer confusion in the wood pellet grill industry (Doc. 6)[2].

Joe Traeger invented the wood pellet grill in the iconic Traeger Barn (Doc. 1). Joe manufactured and sold his new wood pellet grills under the Traeger trademark through Traeger Industries, Inc. ("TII"), a company owned and operated by him and his family (Burton Decl. ¶ 3). TII persistently noted that they were the "originators of the wood pellet grill" (Burton Decl. ¶ 4; Exhibit 3). On February 21, 2006, Traeger Grills purchased all of TII's assets, including all associated intellectual property (Doc. 1). The sale transaction consisted of the Asset Purchase Agreement (Doc. 1, Ex. 6), the Intellectual Property Rights Assignment Agreement (Doc. 1, Ex. 1), and separate Employment Agreements with Joe, Brian, Randy, and Mark Traeger (Doc. 1). Traeger Grills asserts that the "broad intellectual property rights were critical to Traeger Grills' purchase of the TTI assets." (Doc. 1). Indeed, the "parties allocated $9,000,000.00 of the sale price, more than 70% of the total price paid, to the intellectual property assets." (Doc. 1). Both agreements were signed by Traeger Grills, identified as the Buyer, and Joe Traeger, Brian Traeger, Mark Traeger, and Randy Traeger, identified as the Sellers (Doc. 1, Ex's. 1, 6).

---

As such, the Court's use of the term "Defendants" shall encompass only Joe Traeger and Brian Traeger.

[2] Dansons currently markets and sells wood pellet grills in the United States under the brand names PIT BOSS and LOUISIANA GRILLS in competition with Traeger Grill's pellet grills. (Burton Decl. ¶ 27).

In relevant part, pursuant to Article 1.1 of the Asset Purchase Agreement, one of the Purchased Assets included "all goodwill associated with the business." (Doc. 1, Ex. 6). Further, pursuant to Article 2.5 of the Asset Purchase Agreement,

> The ownership of the Business and all assets, properties, agreements and rights associated therewith is evidenced solely by the Purchased Assets, and the intellectual property rights to be conveyed under the Rights Agreement and the sale, assignment, conveyance and delivery of the Purchased Assets to the Buyer pursuant to this Agreement and the patents described in the Rights Agreement will transfer all of the Seller Parties' and any Affiliates' ownership interests associated with or *used or useful in the Business and the Purchased Assets constitute all that have been used in the past to conduct the Business.*

(Doc. 1, Ex. 6) (emphasis added). Then, Article 8 of the Asset Purchase agreement covering the definitions pertaining to the agreement states,

> "Intellectual Property Rights" include but are not limited to the items listed on Exhibit A to the Rights Agreement and all of the patents, applications, trademarks, copyrights, know-how, droit moral, show-how, mask work, proprietary innovations and inventions, methods or techniques, *likenesses or other intellectual property held by the Sellers or any of their Affiliates and used or useful, directly or indirectly, in the Business* and any other matters within the scope of business of the Company whether or not reduced to writing.

(Doc. 1, Ex. 6) (emphasis added).  The same definition is included in Article 8 of the Intellectual Property Rights Assignment Agreement (Doc. 1, Ex. 1).

Further, in relevant part, Section 2.4 of the Intellectual Property Rights Assignment Agreement notes that all the IP rights,

> [I]nclude but are not limited to the items listed on Exhibit A hereto, and all of the patents, trademarks, copyrights, know-how, droit moral, show-how, mask work, proprietary innovations and inventions, methods or techniques or other intellectual property held by the Sellers or any of their Affiliates and used or useful, directly or indirectly, in the Business and any other matters within the scope of business of the Company whether or not reduced to writing**.**

(Doc. 1, Ex. 1). Finally, Exhibit A to the Intellectual Property Rights Assignment Agreement

notes that the IP descriptions include,

> All the patents, patent rights, proprietary info and projects, trade secrets, *personal goodwill and IP assets and properties used or usable in the business, including but not limited to the following: Traeger name and tree logo (which Seller is assigning including any rights to register, in connection with the Business only).* Any other marks, logos, copyrights or other intellectual property used in connection with the Business, *including without limitation likenesses of people and images used in advertising* (who shall sign documentation allowing the Buyer to continue to use the likenesses without cost and deliver said documentation to Seller at Closing), packaging and labeling, artwork used on Business products, product names, including without limitation BBQ070, 075, LHS, PIG, 100, 124, 125, and SW, Traeger Professional, Traeger Executive, Commercial Models, "Lil Pig", "Longhorn Steer" , formulations for shakes, sauces, rubs, samplers, pellets, designs, tooling, masters, stats, dies, photos, TV programs including names, formats, rights, videotapes or films, design, masters, layout, of instruction manuals, training aids and material, video and film productions, cookbooks, recipes Domain names including traegerindustries.com or any other domain name used or registered by the Business, whether or not currently registered using the name "Traeger".

(Doc. 1, Ex. 1).

## DISCUSSION

### A.  Legal Standard

"The purpose of a preliminary injunction is merely to preserve the relative positions of

the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390,

395 (1981).  "A district court may grant injunctive relief if the movant shows the following: (1)

substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the

injunction issues; (3) the threatened injury to the movant outweighs whatever damage the

proposed injunction may cause the opposing party; and (4) if issued, the injunction would not

be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th

Cir. 1998).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989).

### 1. Likelihood of Success on the Merits

The first factor in determining whether a preliminary injunction should issue is whether Traeger Grills can show a substantial likelihood of success on the merits of their claims. Substantial likelihood of success on the merits "is generally the most important" factor in granting preliminary injunctive relief. *CiCi Enters., L.P. v. Four Word Motion, LLC*, No. 16-CV-1679-Orl-41KRS, 2016 U.S. Dist. LEXIS 188678, at *9 (M.D. Fla. Oct. 17, 2016) (quoting, *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla. 2005)). A substantial likelihood of success on the merits does not require a showing of certainty. *Id.*

As an initial matter, for Traeger Grills to establish a substantial likelihood of success on the merits, they must first establish that this Court has the power to hear this case. As such, the Court must address the Defendants' Motion to Dismiss or Transfer for Lack of Federal Jurisdiction (Doc. 54), the response in opposition (Doc. 59), and the reply to the response in opposition (Doc. 66). "A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises." *Fitzgerald v. Seaboard Sys. R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985).

Traeger Grill's basis for asserting personal jurisdiction over the Defendants lies in a contractual clause included in both the Asset Purchase Agreement and the Intellectual Property Rights Assignment Agreement (Doc. 1, Ex's. 1, 6). Specifically, the clause sets forth that the agreements "shall be governed by and construed in accordance with the laws of the State of Florida" and that "exclusive venue for any other dispute between the parties … shall be Hillsborough County, Florida" (Doc. 1 at ¶16; Ex's. 1, 6). In Florida, parties have "the right to

confer personal jurisdiction by agreement." *Jetbroadband WV, LLC v. MasTec N. Am., Inc.*, 13

So. 3d 159, 163 (Fla. 3d DCA 2009). But that right is not unfettered. Even with such an

agreement, "one does not submit to the jurisdiction of the Florida courts merely by signing an

agreement containing a clause conferring such jurisdiction. Instead, the agreement must comply

with all the requirements of Fla. Stat. § 685.101 and Fla. Stat. § 685.102." *Dollar Rent a Car,*

*Inc. v. Westover Car Rental, LLC*, 2:16-CV-363-FTM-29CM, 2017 WL 5495126, at *5 (M.D.

Fla. Nov. 16, 2017) ("[S]ections 685.101 and 685.102 allow parties to confer jurisdiction on

the courts of Florida by contract alone if certain requirements are met.") Specifically, Fla. Stat.

§ 685.101 and Fla. Stat. § 685.102 provide in pertinent part that,

> (1) *The parties to any contract, agreement, or undertaking*,
> contingent or otherwise, in consideration of or relating to any
> obligation arising out of a transaction involving in the aggregate
> not less than $250,000, the equivalent thereof in any foreign
> currency, or services or tangible or intangible property, or both,
> of equivalent value, including a transaction otherwise covered by
> s. 671.105(1), may, to the extent permitted under the United
> States Constitution, agree that the law of this state will govern
> such contract, agreement, or undertaking, the effect thereof and
> their rights and duties thereunder, in whole or in part, whether or
> not such contract, agreement, or undertaking bears any relation
> to this state.
> *(2) This section does not apply to any contract, agreement, or*
> *undertaking:*
> *(a) Regarding any transaction which does not bear a substantial*
> *or reasonable relation to this state in which every party is either*
> *or a combination of:*
> *1. A resident and citizen of the United States, but not of this state;*
> *or*
> *2. Incorporated or organized under the laws of another state and*
> *does not maintain a place of business in this state;*
> 
> …
> 
> (3) This section does not limit or deny the enforcement of any
> provision respecting choice of law in any other contract,
> agreement, or undertaking.
> (4) This section applies to:
> (a) Contracts entered into on or after June 27, 1989; and
> (b) Contracts entered into prior to June 27, 1989, if an action or
> proceeding relating to such contract is commenced on or after
> June 27, 1989.

(Fla. Stat. Ann. § 685.101) (emphasis added).

***

> (1) Notwithstanding any law that limits the right of a person to maintain an action or proceeding, *any person may, to the extent permitted under the United States Constitution, maintain in this state an action or proceeding against any person or other entity residing or located outside this state, if the action or proceeding arises out of or relates to any contract, agreement, or undertaking for which a choice of the law of this state, in whole or in part, has been made pursuant to s. 685.101 and which contains a provision by which such person or other entity residing or located outside this state agrees to submit to the jurisdiction of the courts of this state.*

(Fla. Stat. Ann. § 685.102) (emphasis added). Specifically, in order to satisfy Florida's statutory requirements for consent to personal jurisdiction, the contract, agreement, or undertaking must, *inter alia*[3], "either bear a substantial or reasonable relation to Florida or have at least one of the parties be a resident of Florida or incorporated under its laws." *Jetbroadband WV, LLC v. MasTec N. Am., Inc.*, 13 So.3d 159, 162 (Fla. 3d DCA 2009). It is undisputed that, as of the date of this lawsuit, none of the parties reside in Florida, nor are incorporated or have a principal place of business in Florida (Doc. 54). It is also undisputed that both contracts were executed on February 21, 2006, when Traeger Grills was incorporated in Florida and had its principal place of business in Tampa (Doc. 1, at 6). While the Defendants contend that the relevant date for determining incorporation here is the date of the lawsuit, i.e., July 16, 2019, Traeger Grills contends that it is the date when the parties entered into the agreements at issue, i.e., February 21, 2006 (Doc. 1).

The language in both statutes focuses on the contract itself and the circumstances surrounding it, rather than its relation or that of the parties to Florida at the time of a lawsuit.

---

[3] The Defendants solely place the fifth requirement at issue (Doc. 54).

7

Notably, Fla. Stat. Ann. § 685.101 concerns "*the parties to any contract*, agreement, or undertaking" and "whether or not *such contract*, agreement, or undertaking bears any relation to this state." Fla. Stat. Ann. § 685.101 (emphasis added). Accordingly, the Court finds that the "inception date of the Agreement is the controlling point in time for determining the applicability of the § 685.101 factors." *Travelocity.com LP v. Pier 35 Events, Inc.*, 13-cv-81240-HURLEY, 2014 U.S. Dist. LEXIS 90821, at *26 (S.D. Fla. July 3, 2014). It is undisputed that the agreements were executed on February 21, 2006, when Traeger Grills was incorporated in Florida and had its principal place of business in Tampa (Doc. 1, at 6). Further, though not necessary to meet the fifth prong of the test as it is posed as an either/or requirement, the transaction bears a reasonable relation to Florida considering that one of the parties was incorporated in Florida at the time of the transaction and all documents required for the parties to perform were delivered at the closing in Miami (Doc. 59). As such, the Court finds that it has personal jurisdiction over the Defendants.

### a. Breach of Contract

To prevail on its breach of contract claims, Traeger Grills "must establish the following elements '(1) a valid contract, (2) a material breach, and (3) damages.'" *See De Gazelle Grp., Inc. v. Tamaz Trading Establishment*, 113 F. Supp. 3d 1221, 1223 (M.D. Fla. 2014) (quoting *Havens v. Coast Florida. P.A.*, 117 So. 3d 1179, 1181 (Fla. 2d DCA 2013)). "Agreements are construed to effectuate the intent of the parties, and such intent 'is derived from the objective meaning of the words used.'" *Pottinger v. City of Miami*, 805 F.3d 1293, 1298 (11th Cir. 2015), citing, *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014). In analyzing a contract under Florida law, the Court must first determine whether the contract is ambiguous. *See, e.g.*, *Tingley Systems, Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209 (M.D. Fla. 2007). If a word or phrase in a contract could reasonably be interpreted in more ways than one, it is

ambiguous. *See, e.g.*, *Hinely v. Florida Motorcycle Training, Inc.*, 70 So. 3d 620 (Fla 1st DCA 2011); *Friedman v. Virginia Metal Products Corp.*, 56 So. 2d 513, 33 A.L.R.2d 956 (Fla. 1952). Notably, when a court determines that an ambiguity exists in a contract, it is a question of fact that must be resolved by a trier of fact. *See, e.g.*, *Abis v. Tudin, D.V.M., P.A.*, 18 So. 3d 666 (Fla. 2d DCA 2009); *Soncoast Community Church of Boca Raton, Inc. v. Travis Boating Center of Florida, Inc.*, 981 So. 2d 654 (Fla. 4th DCA 2008); *Wagner v. Wagner*, 885 So. 2d 488 (Fla. 1st DCA 2004). Neither of the parties dispute the existence of a valid contract between them. Instead, the dispute surrounds the alleged material breach.

Traeger Grills contends that the Defendants' knowing consent to Dansons' use of their names, likenesses, and personal goodwill, along with their active participation in Dansons' marketing releases and advertising to directly promote Dansons and its pellet grill products constitutes a material breach of the Intellectual Property Rights Assignment Agreement and the Asset Purchase Agreement (Doc. 1, Ex's. 1, 6). Traeger Grills alleges that such actions are in material breach of the Defendants' promises to assign Traeger Grills the ownership of their names, likenesses, and personal goodwill in connection with the sales and marketing of wood pellet grills (Doc. 6). Further, Traeger Grills alleges that the Defendants' material contract breaches have caused Traeger Grills to suffer damages, including the loss of reasonable royalties for the use of the Defendants' names, likenesses, and personal goodwill in Dansons' advertising, in an amount to be determined at trial (Doc. 6). Specifically, Traeger Grills contends that the following provisions clearly demonstrate that the Defendants assigned to Traeger Grills the ownership of, "and the exclusive and perpetual right to use," all of their IP rights used or usable in the business of marketing and selling wood pellet grills, including their personal names, likenesses, and goodwill in that business:

> All the patents, patent rights, proprietary info and projects, trade secrets, *personal goodwill* and IP assets and properties used or

> usable in the business, including but not limited to the following: *Traeger name and tree logo (which Seller is assigning including any rights to register, in connection with the Business only). Any other marks, logos, copyrights or other intellectual property used in connection with the Business, including without limitation likenesses of people and images used in advertising . . .*

(Doc. 1, Ex. 1) (emphasis added).

\*\*\*

> "Intellectual Property Rights" include but are not limited to the items listed on Exhibit A to the Rights Agreement and all of the patents, applications, trademarks, copyrights, know-how, droit moral, show-how, mask work, proprietary innovations and inventions, methods or techniques, *likenesses or other intellectual property held by the Sellers or any of their Affiliates and used or useful*, directly or indirectly, in the Business and any other matters within the scope of business of the Company whether or not reduced to writing.

(Doc. 1, Ex. 6) (emphasis added). In essence, Traeger Grills claims that these provisions assigned to Traeger Grills the Defendants' rights of publicity. Trager Grills contends that the plain meaning of the word "name" is not limited to use as a trademark or trade name, and the language in the Agreement fails to restrict its meaning, such as by the use of the terms "Traeger name, but only as a trademark," or "TRAEGER trademark." Further, Traeger Grills contends that the language "which Seller is assigning including any rights to register, in connection with the Business only," does not lead to the conclusion that "Traeger name" is used only as a trademark, and could reasonably have included the name for all its commercial purposes. Traeger Grills also contends that the Defendants' personal goodwill and likenesses were sold not solely in a manner used prior to this assignment of rights, but in a broader manner in which they could be "useful" perpetually after the assignment.

Nevertheless, the Defendants contend that the agreements never contemplated assigning the Defendants' publicity rights to Traeger Grills. The Defendants argue that the provisions demonstrate that trademark rights, rather than personal property rights were assigned, as denoted by the words "Traeger name and tree logo (which Seller is assigning any rights to

register, in connection with the Business only)." Further, the Defendants contend that the personal names of Brian Traeger and Joe Traeger fail to appear in the relevant provisions of the agreements cited by Traeger Grills, and that the assigned likenesses of Joe Traeger and Brian Traeger solely included advertisements used by the business up to the date of the agreements.

The Court must initially determine whether the agreements actually assigned the Defendants' rights to publicity to Traeger Grills. A person may not "keep for himself the essential thing he sold, and also keep the price he got for it, by selling the right to use his personal name as a trade name, then advertising his connection with another company in such a way as to arrogate to himself the trade reputation for which he received valuable consideration." *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 824 (2d Cir. 1986). But, while such behavior can be enjoined, a court must establish whether such right was actually sold. *Id.* at 822. In other words, "[w]hether a person who sells the trade name rights to his personal name is barred from using his personal name depends on the terms of the sale." *Id.* at 823.

Based upon a review of the agreements, the Court finds that the contractual terms fail to *unambiguously* provide for an assignment of the Defendants' rights of publicity to Traeger Grills. *Madrigal Audio Labs.*, 799 F.2d at 822 (holding that, "though an individual may sell the right to use his personal name . . . a court will not bar him from using that name unless his 'intention to convey an exclusive right to the use of [his] own name' is 'clearly shown'"); *TravisMathew, LLC v. Leisure Soc'y Unlimited, LLC*, No. SACV12213JSTMLGX, 2012 WL 12878326, at *5 (C.D. Cal. Nov. 20, 2012) (denying the plaintiff's motion upon failure to show that the agreement unambiguously prohibited the defendant from "using his full name as a personal identifier in a commercial context"); *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 398 (2d Cir. 2009) (noting that the district court "was not entitled to supply" a provision assigning

11

the defendant's rights "to use his name for commercial purposes" when such provision failed to exist in the contract, and that the scope of the right to use the defendant's name was ambiguous)[4].

Similar to *JA Apparel Corp.*, the terms of sale here fail to unambiguously provide for the Defendants' assignment of publicity rights to Traeger Grills because both the parties' interpretations of the language in the agreements is reasonable. *JA Apparel Corp.*, 568 F.3d at 398-99. For instance, given that the term "Traeger" is unadorned and only written in lowercase throughout the agreements, as opposed to the trademark (TRAEGER), it could reasonably be read as either referring to the personal name, or only the trademark. Further, the use of the terms "used or useful" in the business could plausibly be read as the assignment of the likenesses of the Defendants as used until the agreements were signed, or perpetually. And, while the Traegers individually signed the agreements, their personal names do not appear in the relevant provisions. Then, the language assigning the "Traeger name and tree logo" could either reasonably be read as an assignment of the personal name, or as the assignment of the trade name and trademark. As the Plaintiff reasonably argues, "Traeger name" is unadorned and unrestricted by terms such as "but only as a trademark" or "TRAEGER trademark." Nevertheless, it can also plausibly be read as the assignment of the trademark only as the terms "Traeger name" are joined with an "and" by "tree logo," the very symbol that appears behind the capitalized trademark. Moreover, while the assignment of "likenesses or other intellectual property held by the Sellers . . . and used or useful," along with the assignment of "likenesses of people and images used in advertising" could plausibly mean the assignment of the likenesses

---

[4] In *JA Apparel Corp.*, the defendant had transferred to the plaintiff all its right, title, and interest to: "[t]he names, trademarks, trade names, service marks, logos, insignias and designations identified on *Schedule 1.1(a)(A),* and all trademark registrations and applications therefor, and the goodwill related thereto (collectively the "Trademarks")." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 398 (2d Cir. 2009).

of the Traegers perpetually, it could also reasonably be interpreted as the assignment of the likenesses of the Traegers as used until the agreements were entered into by the parties (Doc. 1, Ex's. 1, 6). Finally, although the fact that Traeger Grills paid $9,000,000 for the intellectual property rights arguably creates a very strong inference that Traeger Grills obtained the right to prohibit the Defendants from using their names in a non-trademark sense, it nevertheless fails to make the contracts unambiguous as to that issue. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 398 (2d Cir. 2009) (noting that the "fact that JA paid a large price for the Joseph Abboud brand (and existing licensing agreements) does not necessarily mean that JA purchased the right to prohibit Abboud from using his name to refer to himself in a non-trademark sense.").

Given that the Defendants' interpretation of the provisions in the agreements is reasonable, Traeger Grills failed to demonstrate a substantial likelihood of success on the merits of their breach of contract claims. Considering that Traeger Grills failed to establish a substantial likelihood of success on the breach of contract claims, the Court need not address the right of publicity claims.[5] As previously noted, a preliminary injunction is an extraordinary remedy to be used only when a moving party carries its burden as to the four prerequisites. *See Four Seasons*, 320 F.3d at 1210. Traeger Grills failed to carry that burden in this instance.

However, the Court does recognize that there is a distinction in the advertisements that prominently display the name Traeger on the barn. As previously noted, Exhibit A to the Intellectual Property Rights Assignment Agreement notes that the IP descriptions specifically include the "Traeger name" (Doc. 1, Ex. 1). The advertisements reproduced below, along with the language in the agreement, raise additional questions for the Court.

---

[5] During the hearing held before the Court on August 26, 2019, Traeger Grills conceded that the claims for violation of the right of publicity under Fla. Stat. §540.08 live and die with the claims for breach of contract.



(Doc. 6). If the Traeger name had not been displayed in the background of these advertisements, the Court would have less reservation about these advertisements given the findings regarding the ambiguous nature of the agreements as to the right of publicity.  However, the Traeger name displayed on the barn in each of these advertisements appears to be separate and distinct from any individual.  Thus, the Court still has questions regarding these specific advertisements and whether such advertisements should be enjoined. As such, the Court shall schedule by a subsequent order another hearing where the parties will have an opportunity to further be heard on whether these advertisements should be enjoined or not.

Accordingly, it is hereby

ORDERED:

1.  Plaintiff's Motion for Preliminary Injunction (Doc. 6) is DENIED.

DONE AND ORDERED in Tampa, Florida, on this 11th day of September, 2019.

ANTHONY E. PORCELLI
United States Magistrate Judge

15